# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DESIGN BASICS LLC,**

        Plaintiff,

    **-vs-**                      **Case No. 13-C-560**

**CAMPBELLSPORT BUILDING SUPPLY INC.,**
**BERLIN BUILDING SUPPLY INC.,**
**KIEL BUILDING SUPPLY INC.,**
**DREXEL INC.,**
**DREXEL BUILDING SUPPLY INC.,**
**JOEL M. FLEISCHMAN**
**also known as**
**JOEL C. FLEISCHMAN, and**
**ALBERT J. FLEISCHMAN,**

        Defendants and Counterclaim-Defendants,

and

**WILSON MUTUAL INSURANCE COMPANY,**

        Intervenor Defendant and Counterclaimant.

---

# DECISION AND ORDER

---

    This Decision and Order addresses summary judgment motions filed by Intervenor Defendant and Counterclaimant Wilson Mutual Insurance Company ("Wilson Mutual") (ECF No. 41) and the Defendants, Campbellsport Building Supply Inc. ("Campbellsport"), Berlin Building Supply Inc. ("Berlin"), Kiel Building Supply Inc. ("Kiel"), Drexel Inc.

("Drexel"), Drexel Building Supply Inc. ("Drexel Building"), Joel M. Fleischman also known as Joel C. Fleischman ("Joel"),[1] and Albert J. Fleischman ("Albert") (collectively the "Defendants"). (ECF No. 62.) Also addressed are a motion to compel (ECF No. 82), a motion for partial judgment on the pleadings (ECF No. 73), and an expedited non-dispositive motion for leave to file a supplemental reply brief (ECF No. 96), all filed by the Defendants. The latter motion to file a supplemental reply is granted and that brief has been considered.

## SUMMARY JUDGMENT

Wilson Mutual seeks declaratory judgment that there "is no insurance coverage" for Design Basics' allegations against the Defendants. (Mot. 1.) By cross-motion, filed almost five months after Wilson Mutual's and after Design Basics had filed a First Amended Complaint ("Amended Complaint") (ECF No. 52), the Defendants seek declaratory judgment that Wilson Mutual is obligated to indemnify them for those acts of infringement occurring from March 21, 2010, through at least April 1, 2014, and is obliged to provide a defense for all infringement claims alleged in the Amended Complaint.

---

[1] Because two defendants have the surname Fleischman, the Court departs from its usual practice of referring to individuals by surnames and refers to both of these defendants by given name. No disrespect is intended.

## Summary Judgment Standard

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.,* 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.,* 548 F.3d 496, 500 (7th Cir. 2008).

**Relevant Facts**[2]

Plaintiff Design Basics LLC ("Design Basics") is in the business of designing and promoting house plans. Campbellsport, Berlin, Kiel, Drexel, and Drexel Building (the "Defendant Companies") were or are in the business of providing building materials and services to professional contractors and homeowners. Albert was the president of Campbellsport and Drexel from their inception until January 1997 when Joel became president of the two companies. Joel was also the president of Berlin and Kiel which were incorporated in 1999 and 2003, respectively. In early 2013 the four companies merged into Drexel Building, and Joel is its president.

Wilson Mutual issued business and commercial umbrella policies to the Defendant Companies beginning in March 2008:

    a. Businessowners Policy No. BP218869, issued to Campbellsport from March 21, 2008 to March 21, 2009.

    b. Commercial Umbrella Policy No. CU218871, issued to Campbellsport from March 21, 2008 to March 21, 2009.

    c. Businessowners Policy No. BP218869, issued to Campbellsport, Berlin, Kiel, and Drexel from March 21, 2009 to March 21, 2010.

---

[2] The relevant facts are largely based on the parties' proposed statements of fact, to the extent that they are undisputed.

d. Commercial Umbrella Policy No. CU218871, issued to Campbellsport from March 21, 2009 to March 21, 2010.

e. Business insurance Policy No. 32.00407-80, issued to Campbellsport, Berlin, Kiel, and Drexel from March 21, 2010 to April 2, 2013 (includes both commercial general liability coverage and umbrella coverage).

f. Business insurance Policy No. 32.013280-30, issued to Drexel Building from April 1, 2013 to April 1, 2014 (includes both commercial general liability coverage and umbrella coverage).

## Policy Provisions
### March 21, 2008-March 21, 2009

The March 21, 2008 to March 21, 2009, businessowner's policy contains following initial grants of coverage:

PRINCIPAL COVERAGES

"We" provide insurance for the following coverages indicated by a specific "limit" or premium charge on the "declarations."

COVERAGE L—BODILY INJURY LIABILITY/ PROPERTY DAMAGE LIABILITY

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" to which this insurance applies. The "bodily injury" or "property damage" must be caused by an "occurrence" which takes place in the "coverage territory", and the "bodily injury" or "property damage" must occur during the policy period.

(Sandfort Aff., Ex. I pt. 2, AAIS BP-200 Ed. 1.0, at 28 of 42.) (ECF No. 44-10.)

It further provides:

> COVERAGE P—PERSONAL INJURY LIABILITY/ ADVERTISING INJURY LIABILITY
>
> "We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "personal injury" or "advertising injury" to which this insurance applies.
>
> 1. "We" cover:
>
> a. "personal injury" arising out of an offense committed in the course of "your" business, excluding advertising, publishing, broadcasting, or telecasting done by "you" or on "your" behalf; and
>
> **b. "advertising injury" arising out of an offense committed in the course of advertising "your" goods, products, or services.**

(*Id.*, at 29 of 42.) (Emphasis added).

The policy defines advertising injury as follows:

> 3. "Advertising injury" means injury (other than "bodily injury," "property damage", or "personal injury") arising out of one or more of the following offenses:
>
> . . . .
>
> c. infringement of copyright, title, slogan, trademark, or trade name.

(*Id.*, at 24 of 42.) It also contains the following exclusion:

ADDITIONAL EXCLUSIONS THAT APPLY ONLY TO PERSONAL INJURY AND/OR ADVERTISING INJURY

1. "We" do not pay for "personal injury" or "advertising injury" arising out of willful violation of an ordinance, statute, or regulation by an "insured" or with the "insured's" consent.

(*Id.*, at 34 of 42.)

The March 21, 2008 to March 21, 2009, umbrella policy contains the following initial grant of coverage:

Coverage E—Excess Liability

1. "We" pay, up to "our" "limit", all sums in excess of "underlying insurance" for which an "insured" becomes legally obligated to pay as "damages" to which this insurance applies.

This insurance applies only to:

a. "bodily injury" or "property damage":

1) that is caused by an "occurrence" which takes place in the "coverage territory";

2) that occurs during the policy period of this policy; and

3) that is covered by "underlying insurance";

b. "personal injury" arising out of an offense committed in the course of "your" business, excluding advertising, publishing, broadcasting, or telecasting done by "you" or on "your" behalf. The offense must be:

1) committed within the "coverage territory;"

2) committed during the policy period of this policy; and

3) covered by "underlying insurance";

c. **"advertising injury" arising out of an offense committed in the course of advertising "your" goods, products, or services.**

(*Id.*, Ex. J, AAIS UM 0200 04 00, at 8 of 21.) (ECF No.44-11.) (Emphasis

added). It also provides:

Coverage U—Umbrella Liability

1. "We" pay, up to "our" "limit" all sums in excess of either the Retained Limit shown on the "declarations" or the amount payable under "other insurance", whichever is greater, for which an "insured" becomes legally obligated to pay as "damages" because of "bodily injury", "property damage", "personal injury", or "advertising injury" to which this insurance applies.

. . . .

b. This insurance also applies to:

**2) "advertising injury" arising out of an offense committed in the course of advertising "your" goods, products or services.**

(*Id.*, at 9-10 of 21.) (Emphasis added).

The policy defines "advertising injury" as follows:

3. "Advertising injury" means injury, other than "bodily injury," "personal injury," or "property damage," arising out of one or more of the

following offenses:

    c. infringement of copyright, title, slogan, trademark, or trade name.

(*Id.*, at 2 of 21.) It contains an exclusion with respect to coverage U as follows:

### EXCLUSIONS THAT APPLY ONLY TO COVERAGE U

25. "We" do not pay for "personal injury" or "advertising injury" arising out of willful violation of an ordinance, statute, or regulation by an "insured" or with an "insured's" consent.

(*Id.*, at 15 of 21.)

## Policy Provisions
## March 21, 2009-March 21, 2010

The March 21, 2009 to March 21, 2010, businessowners policy has the following initial grant of coverage:

### COVERAGE L—BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. "We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" to which this insurance applies. "We" have the right and duty to defend the "insured" against a "suit" seeking "damages" which may be covered under the Commercial Liability Coverage.

However, "we" have no duty to defend the "insured" against a "suit" seeking "damages"

arising out of "bodily injury" or "property damage" to which this policy does not apply. "We" may investigate "occurrences" and settle claims or "suits" that "we" decide are appropriate.

(*Id.*, Ex. K pt. 2, AAIS BP 0200 01 04, at 48 of 65.) (ECF No. 44-13.)

The businessowners policy further provides:

> COVERAGE P—PERSONAL AND
> ADVERTISING INJURY LIABILITY
>
> 1. Insuring Agreement
>
> a. "We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "personal and advertising injury" to which this insurance applies. "We" have the right and duty to defend the insured against a "suit" seeking "damages" which may be covered under the Commercial Liability Coverage.

(*Id.*, at 56 of 65.)

The policy defines material terms as follows:

> 1. "Advertisement" means a public notice or announcement, including those found in electronic communication or on the Internet, offering "your" goods, products, or services for sale or support to potential buyers, clients, customers, or patrons.
>
> With respect to "advertisements" that appear on websites, only that part of a website that promotes "your" goods, products, or services for sale or support to potential buyers, clients, customers, or patrons is considered an "advertisement."

(*Id.*, at 41 of 65.) The policy further provides:

> 16. "Personal and advertising injury" means

injury, including "bodily injury" that is a consequence thereof, arising out of one or more of the following offenses:

. . . .

**e. infringement of the copyright, slogan, or trade-dress of another in "your" "advertisement"**

(*Id.*, at 45-46 of 65.) (Emphasis added).

The policy has the following exclusions:

> d. "We" do not pay for "personal and advertising injury" arising out of an act committed by or directed by the insured who knew that "personal and advertising injury" would occur as a result of the act.

(*Id.*, at 57 of 65.) The policy also states:

> m. "We" do not pay for "personal and advertising injury" arising out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright.
>
> However, this exclusion does not apply to a violation or infringement of copyright, slogan, or trade-dress rights that occur in your "advertisement."
>
> . . . .
>
> o. "We" do not pay for "personal and advertising injury" arising out of using, without permission, the name or product of others on "your" web site, in "your" e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

(*Id.*, at 58 of 65.)

The March 21, 2009 to March 21, 2010, umbrella policy has the following initial grant of coverage:

> Coverage E—Excess Liability
>
> 1. "We" pay, up to "our" "limit", all sums in excess of "underlying insurance" for which an "insured" becomes legally obligated to pay as "damages" to which this insurance applies.
>
> This insurance applies only to:
>
> a. "bodily injury" or "property damage":
>
>> 1) that is caused by an "occurrence" which takes place in the "coverage territory:'
>>
>> 2) that occurs during the policy period of this policy; and
>>
>> 3) that is covered by "underlying insurance;"
>
> b. "personal injury" arising out of an offense committed in the course of "your" business, excluding advertising, publishing, broadcasting, or telecasting done by "you" or on "your" behalf. The offense must be:
>
>> 1) committed within the "coverage territory";
>>
>> 2) committed during the policy period of this policy; and
>>
>> 3) covered by "underlying insurance";
>
> c. **"advertising injury" arising out of an offense committed in the course of advertising "your" goods, products, or services. The offense must be:**

> **1) committed within the "coverage territory";**
>
> **2) committed during the policy period of this policy; and**
>
> **3) covered by "underlying insurance"**

(*Id.*, Ex. L, AAIS UM 0200 04 00 at 8 of 21.) (ECF No. 44-14.) (Emphasis added).

> Coverage U—Umbrella Liability
>
> 1. "We" pay, up to "our" "limit", all sums in excess of either the Retained Limit shown on the "declarations" or the amount payable under "other insurance", whichever is greater, for which an "insured" becomes legally obligated to pay as "damages" because of "bodily injury", "property damage", "personal injury", or "advertising injury" to which this insurance applies.
>
> b. This insurance also applies to:
>
> . . . .
>
> **2) "advertising injury" arising out of an offense committed in the course of advertising "your" goods, products or services.** The offense must be committed:
>
>> a) within the "coverage territory"; and
>>
>> b) during the policy period of this policy.

(*Id.*, at 9 of 21.) (Emphasis added).

> 2. Coverage U does not apply to "claims" which are covered under Coverage E or would have been covered except for exhaustion of the "limit" of an "underlying insurance" policy.

3. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Defense Coverage.

(*Id.,* at 10 of 21.)

The umbrella policy defines "advertising injury" as follows:

3. "Advertising injury" means injury, other than "bodily injury", "personal injury", or "property damage", arising out of one or more of the following offenses:

. . . .

c. infringement of copyright, title, slogan, trademark, or trade name.

(*Id.*, at 2 of 21.)

The policy has the following exclusions:

EXCLUSIONS THAT APPLY ONLY TO COVERAGE U

1. "We" do not pay for "bodily injury" or "property damage":

. . . .

25. "We" do not pay for "personal injury" or "advertising injury" arising out of willful violation of an ordinance, statute, or regulation by an "insured" or with an "insured's" consent.

(*Id.*, at 13, 15 of 21.)

**Policy Provisions**
**March 21, 2010-April 1, 2013**

The March 21, 2010 to April 1, 2013, business insurance provides

the following initial grant of coverage and exclusions for "personal and advertising injury:"

## SECTION I—COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III–Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments–Coverages A and B.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. . . .

. . . .

**2. Exclusions**

**This insurance does not apply to:**

. . . .

**i. Infringement of Copyright, Patent, Trademark or Trade Secret**

**"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."**

**However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.**

(*Id.*, Ex. M pt. 2, 32.000407-80, CG 0001 (12-07), at 1, 6 of 16.) (ECF No.

44-16.) (Emphasis added).

The business insurance policy defines advertisement as follows:

SECTION V—DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting

customers or supporters. For the purpose of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

(*Id.*, at 13 of 16.) In addition it states:

14. "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

. . . .

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

(*Id.*, at 15 of 16.)

The commercial umbrella policies issued by Wilson Mutual to the Defendants for the period beginning March 21, 2010, and forward contain the following language regarding coverage for an "advertising injury:"

SECTION I—COVERAGES

A. Insuring Agreement

We will pay on behalf of the insured the "ultimate net loss":

a. In excess of the "underlying limit"; or

b. For an "occurrence" covered by this policy which is either excluded or not covered by

the "underlying insurance";

because of . . . "**advertising injury**" to which this Coverage Form applies, caused by an occurrence anywhere in the world.

. . . .

B. Exclusions:

**This insurance does not apply to:**

. . . .

**m. "Advertising injury" arising out of:**

> **(4) the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured.**

. . . .

SECTION VI—DEFINITIONS

1. "Advertising Injury" means injury arising out of one or more of the following offenses committed during the policy period:

> 1. The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy;
>
> **2. Infringement of copyright, title or slogan;** or
>
> 3. Piracy or unfair competition or idea misappropriation.

(*Id.,* CX 7001, at 1, 4 8 of 10; Ex. N pt. 2 32.013280-30, CX 7001, at 1, 4, 8

of 10.) (ECF Nos. 44-16, 44-24.) (Emphasis added).

### Design Basics' Complaints

In its original Complaint, Design Basics alleged that the Defendants had infringed upon three of its registered copyrighted building plans, entitled "Ambrose," "Manning," and "Morgan," and that it first became aware of the copyright violations on May 19, 2010, when it saw an infringement of its Ambrose plans on the website of Signature Homes ("Signature"), a Wisconsin homebuilder. (Compl. ¶ ¶ 15-16.) (ECF No. 1.) Signature called the infringing plan "Allister," and the website contained the notation "Plans copyrighted by: Campbellsport Building Supply." (*Id.* at ¶ 15.)

The Complaint further alleges that the "Defendants, without knowledge or intent, infringed DB's copyright in one or more of its works identified and described in paragraphs 11 through 14 . . . **by publicly displaying, on their web site(s) and elsewhere, for purposes of advertising and marketing, unauthorized copies and/or or derivatives thereof**, in violation of 17 U.S.C. §106(5), and on information and belief, have done so with others of DB's works which are as yet undiscovered." (*Id.* at ¶ 25.) (Emphasis added.) Alternatively, the Complaint alleges that the Defendants "willfully infringed DB's copyright

in one or more of its works . . . by publicly displaying, on their web site(s) and elsewhere, for purposes of advertising and marketing, unauthorized copies or derivatives thereof, in violation of 17 U.S.C. §106(5), and on information and belief, have done so with others of DB's works which are as yet undiscovered." (*Id.* at ¶ 33.)

In its Amended Complaint (filed several months after Wilson Mutual filed its motion for summary judgment), Design Basics names 64 registered copyrighted home building plans, including Ambrose, Manning, and Morgan, that the Defendants allegedly violated by creating derivative works from those plans for their customers. (Am. Compl. ¶ 11.) The Amended Complaint includes the allegations of the original Complaint regarding the discovery of the "Allister" plan on the Signature website. (*Id.* at 13.)

Design Basics further alleges that "[d]uring the course of discovery in this case and review of architectural plans created by Defendants, DB first became aware that Defendants created one or more derivative copies of each of DB's architectural works identified in paragraph 11, supra, which Defendants then provided to their building supply customers for use in constructing residences based thereon." (*Id.* at ¶ 14.) Design Basics attached as "exhibit A" a chart which allegedly identifies "each derivative

work created by each Defendant, with reference to Plaintiff's architectural work on which each derivative work is based." (*Id.* at ¶ 15.) Design Basics alleges that "the Defendants, Campbellsport, and/or Berlin, and/or Kiel, and/or Drexel, and/or [Drexel Building] have infringed DB's copyright-protected plans identified in paragraph 11, supra, by creating the derivative works identified in paragraphs 14 and 15, supra." (*Id.* at ¶ 16.)

Count two of the Amended Complaint alleges that the "Defendants, without knowledge or intent, infringed DB's copyright in the works identified and described in paragraph 11, supra, **by publicly displaying, on their web site(s) and elsewhere, for purposes of advertising and marketing, unauthorized copies and/or or derivatives thereof, in violation of 17 U.S.C. §106(5)**." (*Id.* at ¶ 24.) (Emphasis added.)

Alternatively, in count six, Design Basics alleges that the "Defendants willfully infringed DB's copyright in the works identified and described in paragraph 11, supra, by publicly displaying, on their web site(s) and elsewhere, for purposes of advertising and marketing, unauthorized copies or derivatives thereof, in violation of 17 U.S.C. §106(5)." (*Id.* at ¶ 32.)

### The Accused Plans

The Defendants showed six architectural plans on their own

websites; none of them were plans that Design Basics owns or alleges infringe on its copyrighted plans. The Defendants never advertised any architectural plans, including the Allister, on the radio or on television or in print; but the Allister was publicly displayed and promoted on Signature's website with Drexel Building's knowledge and consent. Signature is not a defendant in this action or an insured of Wilson Mutual.

Also with Drexel Building's knowledge and consent, its floor plan T11-150, which is listed in Design Basic's exhibit A, was displayed in the printed guide for the 2011 Metropolitan Builders Association Parade of Homes ("Parade of Homes") as part of Aspen Homes' featured Jameson model, and Drexel Building's floor plans M08-162 and M08-163, also listed in exhibit A, are currently being publicly displayed and promoted on Westmark Development, LLC's ("Westmark") website promoting its Brighton and Greenview condominiums.

## ANALYSIS

The parties are in apparent agreement that substantive Wisconsin law applies to the insurance issues arising from Design Basics' allegations that the Defendants infringed upon its copyrighted architectural works. In applying Wisconsin law, the Court generally applies the law of the Wisconsin Supreme Court. *Home Valu, Inc. v. Pep Boys,* 213 F.3d 960, 963

(7th Cir. 2000). If, however, "the Wisconsin Supreme Court has not spoken on the issue," the Court must treat "decisions by the state's intermediate appellate courts as authoritative 'unless there is a compelling reason to doubt that [those] courts have got the law right.'" *Id.* (citations omitted). Moreover, if the Court is "faced with two opposing and equally plausible interpretations of state law, '[it should] generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability.'" *Id.*

The interpretation of an insurance policy contract is a question of law for the Court. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 268 Wis. 2d 16, 673 N.W.2d 65, 73 (Wis. 2004). The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties. *Wadzinski v. Auto-Owners Ins. Co.,* 342 Wis. 2d 311, 818 N.W.2d 819, 824 (Wis. 2012). Wisconsin state courts construe a policy as it would be understood by a reasonable person in the position of the insured. *Am. Girl,,* 673 N.W.2d at 73.

The language of the policy determines the extent of coverage. *Soc'y Ins. v. Town of Franklin,* 233 Wis. 2d 207, 607 N.W.2d 342, 345 (Wis. Ct. App. 2000). The policy's words must be given their common and ordinary meaning, and when the policy language is plain and unambiguous, the

policy is enforced as written, "without resorting to the rules of construction or principles from case law." *Johnson Controls, Inc. v. London Market,* 325 Wis. 2d 176, 784 N.W.2d 579, 586 (Wis. 2010). "[I]f the language of a policy is ambiguous, susceptible of more than one reasonable interpretation, [the Wisconsin courts] will construe it narrowly, against the insurer, and in favor of coverage." *Liebovich v. Minn. Ins. Co.,* 310 Wis. 2d 751, 751 N.W.2d 764, 771 (Wis. 2008). "However, [Wisconsin state courts] do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Girl,* 673 N.W.2d at 73.

The Wisconsin courts employ a three-step process to determine whether an insurance policy provides coverage for a claim. First, the courts examine the facts of the claim to determine whether the policy's insuring agreement makes an initial grant of coverage. *Id.* If so, the court next considers whether any of the policy's exclusions preclude coverage. *Id.* If a particular exclusion applies, the court then determines whether any exception to that exclusion reinstates coverage. *Id.*

The insured bears the burden of showing an initial grant of coverage; if that burden is met the burden shifts to the insurer to show that an exclusion nevertheless precludes coverage. *Day v. Allstate Indem.*

*Co.,* 332 Wis. 2d 571, 798 N.W.2d 199, 206 (Wis. 2011). A basic canon of construction in Wisconsin is that exclusions in an insurance policy are narrowly construed against the insurer. *Id.* A court will enforce exclusions that are clear from the face of the policy. *Id.* However, if the effect of an exclusion is ambiguous or uncertain, it will be construed in favor of coverage. *Id.*

The duty to defend is necessarily broader than the duty to indemnify because the duty to defend is triggered by "arguable, as opposed to actual, coverage." *Johnson Controls, Inc.,* 784 N.W.2d at 586; *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.,* 261 Wis. 2d 4, 660 N.W.2d 666, 674 (Wis. 2003). An insurer has a duty to defend if coverage is arguable or fairly debatable, and any doubts are resolved in favor of the insured. *Sawyer v. West Bend Mut. Ins. Co.,* 343 Wis. 2d 714, 821 N.W.2d 250, 255 (Wis. Ct. App. 2012). Insurers must defend when the facts alleged in the four corners of the complaint, if proven, would constitute a covered claim. *Id.* In other words, the duty to defend hinges on the nature, not the merits, of the claims. *Sch. Dist. of Shorewood v. Wausau Ins. Co.,* 170 Wis. 2d 347, 488 N.W.2d 82, 87 (Wis. 1992). The policyholders have the burden of setting forth specific facts to show that the claims or damages occurred during the policy period. *See Kenefick v. Hitchcock,* 187 Wis. 2d 218, 522 N.W.2d 261, 264 (Wis. Ct. App.

1994).

Wilson Mutual's motion seeks a ruling that it has "no coverage" for the claims against the Defendants. However, in its opening and reply briefs (ECF Nos. 42, 71), Wilson Mutual addresses both the duty to defend and the duty to indemnify. In its reply brief Wilson Mutual requests that should the Court determine there is "coverage" for a third-party's advertisements, it declare that Wilson Mutual's obligation to indemnify is limited to the Jameson plan advertised in the 2011 Parade of Homes guide and it disregard the affidavit of Kevin Soyk ("Soyk") (ECF No. 66), which identifies three additional advertisements, because it is a sham affidavit.

The focus of the Defendants' briefs is on the two umbrella policies in force from March 21, 2010, through April 1, 2014 (the "later umbrella policies") which they assert afford them coverage for that time frame. However, they assert that Wilson Mutual must indemnify them for any acts of infringement occurring after March 21, 2010, **and** must provide a defense for all claims alleged in the Amended Complaint.

## Coverage

The Court begins by considering coverage under the later umbrella policies. The issues presented by those policies are: (1) whether the advertising injury coverage covered copyright infringement or whether

such coverage was only provided if the infringements occurred in the course of advertising or in the insured's advertisement; (2) whether, if necessary, the Defendants engaged in advertising the allegedly infringing plans; (3) whether the Defendants were aware of and consented to the advertising of the allegedly infringing plans; and (4) whether the advertising injury exclusion for the willful violation of a penal statute or ordinance applies to bar coverage.

*"Advertising Injury"*

Wilson Mutual's later umbrella policies described its obligations to its insureds as follows:

> SECTION I—COVERAGES
>
> A. Insuring Agreement
>
> We will pay on behalf of the insured the "ultimate net loss":
>
>> a. In excess of the "underlying limit"; or
>>
>> b. **For an "occurrence" covered by this policy which is either excluded or not covered by the "underlying insurance"**; because of . . . "advertising injury" to which this Coverage Form applies, caused by an occurrence anywhere in the world.

(Sandfort Aff., Ex. M pt. 2, 32.000407, CX 7001 at 1 of 10; Ex. N pt. 2, 32.013280-30, CX 7001 at 1 of 10.) (Emphasis added). The broad scope of

the coverage afforded by the later umbrella policies obligates Wilson Mutual to pay for an occurrence covered by the policy regardless of whether the occurrence is excluded from the underlying insurance. In other words, the umbrella policy not only provides excess coverage for occurrences covered by the underlying policy — it also provides coverage for occurrences that are not covered by the underlying insurance.

The umbrella coverage policies have a set of definitions which are distinct from the definitions in the underlying insurance. As defined in the later umbrella policies, "advertising injury" includes injury arising out of infringement of copyright committed during the policy period. There are no additional requirements. The definition does not require that the infringement occur in the context of any advertising, nor does the umbrella policy exclude coverage for advertising injury based on copyright infringement.

Wilson Mutual does not acknowledge that the definitions in its business policies and its umbrella policies are different, and that the umbrella policies include injury arising out of copyright infringement but do not include the additional requirements found in the underlying business policies that the infringement occur in the context of advertising or in the insured's own advertisement. The differing definitions in the two

types of policies are the result of Wilson Mutual's drafting, and it bears the consequences of the language it chose.

Wilson Mutual relies on *Krueger Int'l, Inc. v. Fed. Ins. Co.,* 647 F. Supp. 2d 1024 (E.D. Wis. 2009), and *Fireman's Fund.* Policies analyzed in those cases defined "advertising injury" in terms mirroring Wilson Mutual's umbrella policies. However, all three policies also included an additional, explicit requirement that the advertising injury result from the actual advertising of the insured's goods or services: "We'll pay amounts any protected person is legally required to pay as damages for **covered advertising injury that . . . results from the advertising of your products, work or completed work**." *Krueger Int'l,* 647 F. Supp. 2d at 1028 (St. Paul policy) (emphasis added); "Advertising injury means injury, other than bodily injury or personal injury arising solely out of one or more of the following offenses **committed in the course of advertising of your goods, products or services** . . ." *Id.* at 1029 (Federal policy) (emphasis added); "This insurance applies to . . . [a]dvertising injury caused by an offense **committed in the course of advertising your goods, products or services**." *Fireman's Fund,* 660 N.W.2d at 674-75 (emphasis added). Thus, the policies in *Krueger* and *Fireman's Fund* included additional conditions not found in Wilson Mutual's umbrella

policies.

"The duty to defend an insured is based on the language in the insurance contract." *Johnson Controls,* 784 N.W.2d at 586. The language of the policies in *Krueger* and *Fireman's Fund* was materially different, and included additional requirements, than that of the later Wilson Mutual umbrella policies and those cases are not controlling.

*Advertisements*

In an abundance of caution, the Court addresses Wilson Mutual's argument that because the word "advertising" appears in the defined term "advertising injury," there must be some nexus to advertising to trigger coverage. Several of the allegedly infringing plans have been the subject of advertising during the period of coverage afforded by the later umbrella policies: (1) the Allister floor plan was displayed on Signature's website in May 2010; (2) the first and second floor plans from plan no. T11-150 were included in the 2011 Parade of Homes guide featuring Aspen Homes' Jameson model; and (3) plans M08-162 and M08-163 are currently displayed on Westmark's website promoting its Brighton and Greenview condominiums. Thus, even under Wilson Mutual's view, it would have a duty to indemnify the Defendants for those four plans.

Wilson Mutual also contends that the websites and Parade of Homes

guide were not the Defendants' advertisements, but those of a third party and, therefore, do not fall within the coverage afforded by the later umbrella policies. However, those policies do not expressly require that the infringement occur in any advertising or restrict coverage to infringements that appear only in the insured's advertisements. Wilson Mutual could have included such requirements. Indeed, they were included in the underlying insurance policies and in the business and umbrella policies Wilson Mutual issued to the Defendant Companies between March 2008 and March 2010, so their absence in the later umbrella policies reflects an intent not to impose the requirements. *See Acuity v. Ross Glove Co.,* 344 Wis. 2d 29, 817 N.W.2d 455, 463 (Wis. Ct. App. 2012) (holding that the Acuity policy which defined "advertisement" as a notice that is published to the general public, "does not require that [the insured] be the publisher, much less that it be the first, last or only, entity to publish; it simply requires that [the insured's] notice be published."). Wilson Mutual's later umbrella policies do not require that any advertising activity be undertaken by the defendants themselves. Given that ambiguity in coverage terms must be construed against the insurer, *Estate of Sustache v. Am. Family Mut. Ins. Co.,* 311 Wis. 2d 548, 751 N.W.2d 845, 851 (Wis. 2008), there is no basis to read such a requirement into the later umbrella

policies.

*Willful Violation of a Penal Statute*

Wilson Mutual also asserts, in passing, that the policy exclusion for "willful violation of a penal statute or ordinance" precludes coverage for the copyright infringement claims against the Defendants, relying in part on Soyk's declaration averring that the Defendants were aware of and consented to the display of the identified plans in certain print and internet advertising. (Soyk Aff. ¶ 4.) Soyk did not aver to an awareness of and consent to the *infringement* of any work owned by Design Basics. Wilson Mutual's policy exclusion does not exclude coverage for injury caused by willful advertising. Furthermore, Wilson Mutual cites no facts in the record to support a conclusion of willful infringement on the Defendants' part, and no authority to support its characterization of 17 U.S.C. § 106(1) as a penal statute. Wilson Mutual has not met its burden of establishing that the exclusion is applicable. *See Day,* 798 N.W.2d at 206.

*Scope of Indemnification*

The Defendants indicate that at least 38 of the allegedly infringing home plans were finished after March 21, 2010. As "offenses" or occurrences of advertising injury during the policy periods covered by later umbrella policies, the occurrences fall within the coverage of those policies.

Wilson Mutual therefore has an obligation to indemnify Defendants for those alleged acts of infringement.

Wilson Mutual asserts that its duty to indemnify should be limited based on the Defendants' August 2014, response to interrogatory no. 1, which asked whether the Defendants advertised any of the allegedly infringing architectural plans "in print, radio or television," and if "yes" to provide additional information. (Doc. 70-1, at 2.) The response was, "Defendants' investigation continues," and two instances were identified in which allegedly infringing plans were advertised in print: T07-154 in the 2007 Parade of Homes guide (before Wilson Mutual issued any policies to the Defendants); and T11-150 in the 2011 Parade of Homes guide. (*Id.*)

Wilson Mutual seeks to bar any duty to indemnify the Defendants based on other subsequently identified infringements, in particular those arising from the Soyk declaration which identifies the Allister, Brighton and Greenview plans as being advertised on the internet. Such instances were not print, radio, or television advertising, and do not conflict with the Defendants' interrogatory answer. If advertising the plans is subsequently determined to be a condition for coverage under "advertising injury," coverage would extend to the plans advertised in any way during the policy period, without the limitation suggested by Wilson Mutual.

*Duty to Defend*

The Defendants also assert that, because Wilson Mutual has a duty to indemnify them under the later umbrella policies for infringements occurring after March 21, 2010, it also has a duty to provide a defense to all of the infringements alleged in the Amended Complaint. The Defendants are correct. *See Fireman's Fund,* 660 N.W.2d at 674. ("[W]hen an insurance policy provides coverage for even one claim made in a lawsuit, the insurer is obligated to defend the entire suit.").

Based on the foregoing, Wilson Mutual's motion for summary judgment is granted to the extent that it has no duty to indemnify the Defendants with respect to its policies predating March 21, 2010. The Defendants' cross motion for summary judgment is granted: Wilson Mutual is obligated to indemnify the Defendants for those acts of infringement occurring after March 21, 2010, and to provide a defense to the Defendants for all of the infringement claims alleged in the Amended Complaint.

## MOTION TO COMPEL

The Defendants seek the production of 233 documents listed in Design Basics' privilege log, and they contend the documents are relevant and discoverable, not subject to the Michigan investigator privilege, and that Design Basics has waived any attorney-client privilege or work-

product protection. They also seek an award of expenses pursuant to Fed. R. Civ. P. 37(a)(5)(A). Design Basics contends that the communications between its attorneys and its private investigator agents are protected by the Michigan private investigator privilege, the attorney-client privilege, and work-product protections, and that its production of factual reports from the investigators did not waive the privilege.

District courts enjoy broad discretion in controlling discovery. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006). Under Fed. R. Civ. P. 26(b)(1) parties may obtain information regarding any nonprivileged matter relevant to a claim or defense. If a party refuses to respond to a discovery request, the opposing party may move for an order to compel disclosure. Fed. R. Civ. P. 37(a).

Because federal law provides the rule of decision in this case, federal common law, as interpreted in the federal courts in light of reason and experience, governs Design Basics' privilege protection claim. *See* Fed. R. Evid. 501; *Jaffee v. Redmond*, 518 U.S. 1, 6 (1996); *Wartell v. Purdue Univ.*, No. 1:13-CV-99 RLM-APR, 2014 WL 4261205, at *3 (N.D. Ind. Aug. 28, 2014). (Rejecting suggestion that Indiana law applied to privilege issue, and indicating that federal court of appeals is in a better position to add or limit federal privilege law if the state has a good idea.) Thus, the focus of

this decision is on Design Basics' assertion that the materials are protected by the attorney-client privilege and/or under the work-product doctrine, and that it has not waived those protections by producing the investigators reports.

The attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice. *Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). The analysis is "(1) whether 'legal advice of any kind [was] sought . . . from a professional legal adviser in his capacity as such'; and (2) whether the communication was 'relat[ed] to that purpose' and 'made in confidence . . . by the client.'" Id. (citation omitted). "[T]he attorney-client privilege protects not only the attorney-client relationship in imminent or ongoing litigation but also the broader attorney-client relationship outside the litigation context." *Id.* at 621.

The attorney-client privilege is "generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) (citing with approval *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851 (3rd Cir. 1994)). Intentionally disclosing privileged or work-

product protected materials may also waive the privilege or protection for undisclosed materials if they concern the same subject matter and ought in fairness to be considered together with the disclosed materials. Fed. R. Evid. 502.

The work-product doctrine is distinct from and broader than the attorney-client privilege. *United States v. Nobles*, 422 U.S. 225, 238 n.11, (1975). The doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). At its core, the work-product doctrine shelters the mental processes of an attorney, providing a privileged area in which the attorney can analyze and prepare a client's case. *Nobles*, 422 U.S. at 238. The doctrine is an "intensely practical" one, grounded in the realities of adversary litigation. *Id*. To establish work-product protection, a party must show that the document was in fact created in anticipation of litigation. *Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). In determining whether the protection applies, courts look to whether "in light of the factual context 'the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Id*. at 976-77 (quoting *Binks Mfg. Co. v. Nat'l*

*Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983)).

The work-product protection is qualified; it may be overcome if a party can establish a "substantial need" for the material and an inability to obtain equivalent materials without "undue hardship," although an attorney's "mental impressions, conclusions, opinions, or legal theories" are to be protected. Fed. R. Civ. P. 26(b)(3)(A), (B). Like the attorney-client privilege, the work-product protection may be waived. *See Nobles*, 422 U.S. at 239 (finding the defendant waived work-product protection as to matters covered in investigator's testimony by presenting investigator as a witness).

Design Basics' disclosure of reports from investigators relating to its Ambrose, Manning, and Morgan plans (ECF No. 27-12) and its naming of investigators Norman Barnard, John M. Pratt, and John C. White as potential lay witnesses provide the basis for the Defendants' contention that any privilege has been waived. (*See* Defs. Br. Mot. Compel, 2-3.) (ECF No. 83.)

Review of those investigative reports and consideration of the information disclosed by the privilege log (ECF No. 84-4) does not provide sufficient information for the Court to determine whether the documents are protected by the attorney-client privilege or work-product protections

and, if so, whether there has been a waiver of the privilege and/or protection.

Therefore, the Court will grant the Defendants' motion to compel to the extent that it will require Design Basics to file under seal for the Court's in camera review copies of the 233 documents and any proposed redactions. That submission must be accompanied by a brief providing a specific explanation of the legal basis for Design Basics' withholding of each document. In addition to that sealed filing, Design Basics must deliver to the Court a complete set of those materials.

## PARTIAL JUDGMENT ON THE PLEADINGS

The Defendants seek partial judgment on the pleadings dismissing two sets of claims as being barred by the 3-year statute of limitations applicable to copyright infringement claims, 17 U.S.C. 507(b): (1) claims in the original Complaint arising out of alleged infringements occurring prior to May 16, 2010; and (2) claims in the Amended Complaint arising out of alleged infringements occurring prior to July 13, 2011.

Design Basics responds that under the discovery rule such claims are not time-barred. It also contends that the doctrine of equitable tolling is applicable and, therefore, none of its claims are barred by the Copyright Act's three-year statute of limitations. (ECF No. 94.) In support of its

equitable tolling argument, Design Basics proffers the supplemental declaration of its attorney, Michael T. Hopkins ("Hopkins"), which presents excerpts of the transcripts from the February 19, 2015, depositions of Soyk and Edward Ochs ("Ochs"). (ECF Nos. 95, 95-1, 95-2.)

The Defendants assert that the Court should ignore the proffered deposition testimony; Design Basics' allegations do not provide a basis for equitable tolling; and in any event, at this stage of the proceedings, the Court should not find that equitable tolling applies or that all of Design Basics' claims are timely. (ECF No. 97.)

### *Standard for Judgment on the Pleadings*

A Rule 12(c) motion will only be granted if the moving party is able to demonstrate that there are no material issues of fact to be resolved. *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). Rule 12(c) motions are reviewed under the same standard as Rule 12(b) motions, so the facts set forth in the Complaint are viewed in the light most favorable to the non-moving party. *Id.* In addition to the Complaint and Answer, any "copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Fed. R. Civ. P. 10(c).

The pleading must include more than mere legal conclusions or a

recitation of the cause of action's elements, but it does not require detailed factual allegations. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The pleading must meet a plausibility threshold; mere possibility is not enough. *Id.* at 570. Plausibility means there are enough facts in the complaint for a reviewing court to draw a reasonable inference that the pleader is entitled to relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009). Some pleaded facts must support the claim. *Id.*; *McCauley v. City of Chi.,* 671 F.3d 611, 616-17 (7th Cir. 2011); *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404-05 (7th Cir. 2010).

In general, if any material outside the pleadings is presented to, and not excluded by the Court, the Rule 12(c) motion must be treated as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, a court may consider matters outside the pleadings that are subject to judicial notice[3] without converting the motion to one for summary judgment. *See United States v. Wood*, 925 F.2d 1580, 1581-82 (7th Cir. 1991).

The substance of the deposition testimony of Soyk and Ochs is

---

[3] In order for a fact to be subject to judicial notice, it must be one "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts strictly adhere to these criteria because "the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and, in effect, directing a verdict against him as to the fact noticed." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1083 (7th Cir.1997) (citation omitted).

subject to reasonable dispute and, therefore, judicial notice is not proper. See *Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.,* Case No. 12-cv-01851, 2013 WL 80369, at *4 (N.D. Ill. Jan 7, 2013); *Menominee Indian Tribe of Wis. v. U.S. Dep't of Interior,* Case No. 09-C-496, 2010 WL 4628916, at *4 (E.D. Wis. Nov. 4, 2010) (declining to take judicial notice of testimony presented to a U.S. House of Representatives Committee); *ABN AMRO, Inc. v. Capital Int'l Ltd.,* Case No. 04 C 3123, 2007 WL 845046, at *5 (N.D. Ill. Mar. 16, 2007) (declining to take judicial notice of various papers including deposition transcripts, "at least for the truth of the matters asserted in them.")

Given the choices presented by Rule12(c) and the current posture of this action, the Hopkins Declaration and its exhibits are excluded, and the Court's ruling is based on the parties' pleadings and the attachments thereto.

### *Factual Background[4]*

As previously noted, Design Basics first became aware of the Defendants' alleged copyright violations on May 19, 2010, when it saw an infringement of its Ambrose plans on Signature's website. Signature's plan

---

[4] The factual background is based on the factual allegations of the Amended Complaint, which has superseded the original Complaint, and which are taken as true for purposes of this motion. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004).

was called Allister and was accompanied by the notation "Plans copyrighted by: Campbellsport Building Supply." (Am. Compl. ¶ 13.) Design Basics alleges that the Defendants violated the registered copyrights on 64 of its home building plans, including Ambrose, Manning, and Morgan, by creating derivative works from those plans for their customers. (*Id.* at ¶ 11.)

In addition to alleging four counts of non-willful copyright infringement (counts one through four) and four alternative counts of willful copyright infringement (counts five through eight), Design Basics alleges one additional and alternative count (count nine) that the Defendants violated the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §1202 when they created the identified derivative works by intentionally removing and omitting Design Basics' copyright management information from copies of its works; distributing copies or derivatives of such works knowing that such copyright management information had been removed or omitted without proper authorization; and knowing, when they removed such information and at the time they distributed copies of the works from which the copyright management information had been removed or omitted, that such behavior would induce, enable, facilitate, or conceal the infringement of DB's copyright protected works. (*Id.* at ¶¶ 37-

41.)

Exhibit A to the Amended Complaint identifies "each derivative work created by each Defendant, with reference to [Design Basics'] architectural work on which each derivative work is based." (*Id.* at ¶ 15, Ex. A.) The earliest year of an infringement is 1994, and the most recent is 2014. (Ex. A.)

## *Analysis*

The Copyright Act provides that "[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). As emphasized in *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.,* 770 F.3d 610, 613-14 (7th Cir. 2014):

> When a defendant charges noncompliance with the statute of limitations, "[d]ismissal under Rule 12(b)(6) [is] irregular, for the statute of limitations is an affirmative defense." Because "complaints need not anticipate and attempt to plead around defenses," a motion to dismiss based on failure to comply with the statute of limitations should be granted only where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.". In other words, the plaintiff must affirmatively plead himself out of court; the complaint must "plainly reveal[ ] that [the] action is untimely under the governing statute of limitations."

(Internal citations omitted).

The Court of Appeals for this Circuit applies the "discovery rule," which tolls the accrual date for the copyright statute of limitations until "the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights." *Gaiman v. McFarlane,* 360 F.3d 644, 653 (7th Cir. 2004) (citing *Taylor v. Meirick,* 712 F.2d 1112, 1117 (7th Cir. 1983)).

The Defendants rely on *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 134 S.Ct. 1962, 1969 (2014), which states "[a] copyright claim . . . arises or 'accrue[s]' when an infringing act occurs," and they interpret *Petrella* as meaning that the Court should not apply the discovery rule in this case. However, in *Petrella* the Supreme Court also explicitly said it was not passing on the question of the "nine Courts of Appeals [who] have adopted, as an alternative to the incident of injury rule, a 'discovery rule,' which starts the limitations period when 'the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" *Id.* n.4. Thus the Supreme Court has not ruled on the issue, nor has the Seventh Circuit. *See Mongolian House,* 770 F.3d at 614, 615 (acknowledging that the Seventh Circuit "recognizes a discovery rule in copyright cases" and expressing no opinion on *Petrella*'s effect on the discovery rule); *see also Panoramic Stock Images, Ltd v. McGraw-Hill*

*Global Educ. Holdings, LLC,* Case No. 12 C 9881, 2014 WL 6685454, at *3 (N.D. Ill. Nov. 25, 2014) (citing *Panoramic Stock Images, Ltd. v. John Wiley & Sons, Inc.,* Case No. 12-cv-10003, 2014 WL 4344095, at *7 (N.D. Ill. Sept. 2, 2014) (holding that *Petrella* did not abrogate this circuit's discovery rule); *Frerck v. Pearson Educ., Inc.,* Case No. 11 CV 5319, ___ F. Supp. 3d ___ , 2014 WL 3906466, at *3 n.3 (N.D. Ill. Aug. 11, 2014) (same); *Beasley v. John Wiley & Sons, Inc.,* Case No. 12 C 8715, ____ F. Supp. 3d ___ , 2014 WL 3600519, at *6 n.5 (N.D. Ill. July 21, 2014) (same); *Frerck v. John Wiley & Sons, Inc.,* No. 11-cv-2727, 2014 WL 3512991, at *6 n.5 (N.D. Ill. July 14, 2014) (same)), opinion clarified, 2015 WL 393381 (N.D. Ill. Jan. 27, 2015). As a general rule, however, the issue of what a "reasonable person should have known" is a question for the trier of fact. *Cf. Kedzierski v. Kedzierski,* 899 F.2d 681, 683 (7th Cir. 1990) (applying Illinois law). *See also Doe v. Paukstat,* 863 F. Supp. 884, 892-93 (E.D. Wis. 1994) (denying summary judgment regarding application of Wisconsin discovery rule.)

Given the controlling case law of the Seventh Circuit Court of Appeals which is in accord with that of eight other courts of appeals, the Court declines the Defendants' invitation to delve into statutory interpretation. Since Design Basics initial discovery of some acts of copyright infringement was on May 19, 2010, its claims are timely.

Furthermore, the Defendants' removal of Design Basics' copyright information from the plans may provide a basis for equitable tolling, which applies in copyright infringement cases. *See Taylor,* 712 F.2d at 1118. Therefore, the Defendants' motion for partial judgment on the pleadings is denied.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Wilson Mutual's motion for summary judgment (ECF No. 41) is **GRANTED** with respect to its lack of a duty to indemnify the Defendants for any copyright infringement claims arising prior to March 21, 2010, and **DENIED** with respect to any claims due to copyright infringement between March 21, 2010, and April 1, 2014;

The Defendants' cross motion for summary judgment (ECF No. 62) is **GRANTED**. Wilson Mutual is obligated to indemnify the Defendants for those acts of infringement occurring after March 21, 2010, and to defend the Defendants for all of the infringement claims alleged in the Amended Complaint;

The Defendants' motion to compel (ECF No. 82) is **GRANTED** to the extent that **no later than April 30 2015,** Design Basics must file under seal for the Court's *in camera* review copies of the 233 documents

and any proposed redactions and a brief providing a specific explanation of the legal basis for its withholding of each document. In addition to that sealed filing, Design Basics must deliver to the Court a complete paper copy of those materials;

The Defendants' expedited non-dispositive motion for leave to file a supplemental reply brief (ECF No. 96) is **GRANTED**; and

The Defendants' motion for partial judgment on the pleadings (ECF No. 73) is **DENIED**.

Dated at Milwaukee, Wisconsin, this __10th__ day of April, 2015.

BY THE COURT:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**